IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROGER PERRY, | ) | CASE NO. 1:17-cv-02067 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Roger Perry ("Plaintiff" or "Perry") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his

applications for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 13.

For the reasons explained herein, the Court finds that the ALJ did not adequately consider

or weigh the opinions of the medical expert or the opinions of the state agency reviewing

physicians/psychologists. Without a more thorough analysis of the medical opinion evidence,

the Court is unable to assess whether the ALJ's Step Three findings and/or RFC assessment are

supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the

Commissioner's decision for further proceedings consistent with this opinion.

# I. Procedural History

On December 12, 2011, Perry protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1] Tr. 11, 271-272, 273-278. Perry alleged a disability onset date of January 1, 2010. Tr. 11, 82, 110, 271, 273. He alleged disability due to problems with both legs, low back degenerative disc disease, memory problems, hearing problems, depression, sciatica, and osteoarthritis of right hip. Tr. 82, 110, 164, 176. After initial denial by the state agency (Tr. 164-170) and denial upon reconsideration (Tr. 176-187), Perry requested a hearing (Tr. 188-189). A hearing was held before Administrative Law Judge Peter Beekman ("ALJ") on December 18, 2013. Tr. 56-81. On March 10, 2014, the ALJ issued an unfavorable decision (Tr. 140-157), finding that Perry had not been under a disability within the meaning of the Social Security Act from January 1, 2010, through the date of the decision (Tr. 143, 153).

Perry requested review of the ALJ's decision by the Appeals Council. Tr. 211-212. On June 17, 2015, the Appeals Council remanded the case to the ALJ. Tr. 158-163. In its June 17, 2015, Order "Remanding Case to Administrative Law Judge," the Appeals Council found that, in assessing Perry's RFC, the ALJ did not adequately weigh the medical opinions of the state agency reviewing physicians regarding Perry's musculoskeletal impairment and the ALJ did not adequately weigh the medical opinions of the state agency reviewing psychologists. Tr. 160-161. On remand, the ALJ was ordered to obtain additional evidence regarding Perry's impairments; give further consideration to the non-examining source opinions; give further

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 10/3/2018).

consideration to Perry's maximum RFC; and if warranted, obtain evidence from a vocational expert. Tr. 161.

Pursuant to the remand order, on December 9, 2015, the ALJ conducted an administrative hearing at which Perry and a medical expert testified. Tr. 32-55. Following the hearing, on March 30, 2016, the ALJ sent interrogatories to the vocational expert Bruce V. Holderead ("VE"). Tr. 392-399. On April 6, 2016, the ALJ proffered the VE's responses to Perry's counsel. Tr. 400-401. On May 20, 2016, Perry, through counsel, responded to the proffer, stating that Perry had no comments regarding the VE's vocational analysis and, instead, was relying on the medical expert's hearing testimony that Perry met Listing 12.05C and equaled Listing 1.02. Tr. 403.

On September 9, 2016, the ALJ issued his decision (Tr. 8-31), concluding that Perry had not been under a disability within the meaning of the Social Security Act from January 1, 2010, through the date of the decision (Tr. 12, 24). Perry requested review of the ALJ's September 9, 2016, decision by the Appeals Council. Tr. 269-270. On August 25, 2017, the Appeals Council denied Perry's request for review, making the ALJ's September 9, 2016, decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

**A.      Personal, vocational and educational evidence**

Perry was born in 1969. Tr. 271. He was 46 years old at the time of the December 9, 2015, hearing. Tr. 37. Perry was not married and had no children. Tr. 493. Perry completed school through the eighth grade. Tr. 41. He dropped out of school. Tr. 42. When he was in school he was enrolled in an alternative educational program – he had leukemia[2] and had a tutor

---

[2] Perry's leukemia was in remission and had been for years. Tr. 493.

come to his house.  Tr. 42, 493.  Perry's past work included work as a grinder, assembler, construction worker, and bicycle repairer.  Tr. 23, 397.

**B.      Medical evidence**

**1.      Treatment history**

The parties provide detailed summaries of Perry's medical treatment history in their briefs.  Doc. 15, pp. 4-10, Doc. 16, pp. 2-9.  As reflected therein, during the relevant time period, Perry received medical treatment for hip, back and leg pain.  *Id.*  Considering the detailed summaries provided by the parties, a less detailed summary is included herein.

In December 2010, hip surgery was being discussed but Perry was working out issues with disability and Medicaid.  Tr. 407, 444, 445.  Treatment notes from April 2011, continue to reflect that surgery on Perry's right hip was needed but he relayed that the orthopedic doctors wanted to wait until Perry was on Medicaid.  Tr. 441.  Perry relayed that his back started bothering him towards the end of 2011 after changing a tire lug nut that had been stuck.  Tr. 407.  X-rays and MRIs from November and December 2011 showed herniated discs.  Tr. 407.

In April 2012, Perry was seen by Dr. Stephen Dechter, D.O., at the Physical Medicine and Rehabilitation ("PMR") clinic.  Tr. 509-513.  Dr. Dechter noted that Perry had been seen by his primary care physician, ortho and ortho-spine and that ortho-spine had recommended non-surgical treatment because Perry continued to smoke one and one-half packs of cigarettes per day.  Tr. 510, 516-517.  Dr. Dechter recommended that Perry quit smoking, attend physical therapy, engage in a home exercise program, consider a TENS unit, and undergo an evaluation for a quad cane versus a walker.  Tr. 513.   In June 2012, Perry had an epidural steroid injection.  Tr. 529.  Perry reported that the injection provided relief for not more than one month.  Tr. 501 (reporting one to two weeks relief); Tr. 529 (reporting relief for one month).  Perry had attended

some physical therapy sessions but missed some so he requested another referral in October 2012.  Tr. 529.

In November 2013, Perry saw Dr. Eric Mayer, M.D., at the Center for Spine Health department regarding his low back and left leg pain.  Tr. 632-634.  Dr. Mayer observed that Perry had failed to improve with pain medication, physical therapy and injections.  Tr. 632. Perry walked with an antalgic gait "and cane with endorsement of prior right hip dislocation[.]" Tr. 632.  Perry's posture was camptocormic.[3]  Tr. 632.  Perry relayed that his pain was worse with almost all activities and nothing really reduced his pain.  Tr. 632.  Dr. Mayer's assessment was chronic pain associated with significant psychosocial dysfunction and lumbago.  Tr. 633. Dr. Mayer noted that Perry endorsed depressive thoughts but denied current intent to harm himself or others.  Tr. 633.  Dr. Mayer recommended and referred Perry for a psychiatric evaluation and treatment.  Tr. 633.  Once Perry provided him with his outside films, Dr. Mayer agreed to review them but noted that there was a strong likelihood that Perry would require "treatment in the context of a functional restoration program with clear evidence of 3-4/5 non-organic signs as described by Waddell . . . these signs often preclude a successful surgery."  Tr. 633.

In January 2015, Perry saw Dr. Hong Shen, M.D., a pain management doctor for chronic pain in his low back, legs and right knee.  Tr. 640-644, 652.  Dr. Shen noted that Perry had been treated at the PMR clinic with Vicodin and an epidural injection.  Tr. 642.  The injection provided relief for about two months.  Tr. 642.  Dr. Shen noted that a urine screen was positive for morphine, oxycodone, and benzodiazepines so the opioid medication was stopped.  Tr. 642. Perry was continuing to smoke.  Tr. 642.  Dr. Shen observed that Perry ambulated with a cane,

---

[3] Camptocormia is "a static deformity consisting of forward flexion of the trunk[.]"  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 275.

his gait was antalgic, and his right hip rotated out. Tr. 643. Perry's range of motion in his right knee was within normal limits. Tr. 643. A lumbar spine examination revealed diffuse tenderness on palpation over the lumbar paraspinal muscles. Tr. 643. A sensory examination was normal to light touch. Tr. 643. Dr. Shen agreed with Dr. Mayer's decision to discontinue the opioid medication. Tr. 643. Dr. Shen felt that Perry could benefit from a chronic pain rehabilitation program and emphasized that Perry should quit smoking. Tr. 644. Perry saw Dr. Shen again in May 2015. Tr. 648-652. Perry had not followed up with the chronic pain clinic. Tr. 649. His pain continued to persist and had not changed. Tr. 649. Dr. Shen noted that Perry was able to ambulate with a cane. Tr. 649. Dr. Shen relayed that he felt that Perry could benefit from a chronic pain rehabilitation program and the information for the clinic was provided to Perry. Tr. 649.

### 2. Opinion evidence

#### a. Consultative examiner

On April 2, 2012, consultative examining psychologist Mitchell Wax, Ph.D., conducted an evaluation of Perry. Tr. Tr. 492-498. Perry's chief reason for why he was unable to work was that he had medical problems and was slow. Tr. 493. On WAIS-IV testing, Perry's FSIQ was a 72, falling in the borderline range. Tr. 495. Dr. Wax noted that Perry's true intellectual functioning might be higher based on the fact that, during the evaluation, Perry appeared disinterested and inattentive. Tr. 495. Dr. Wax also observed that the testing results suggested a learning disorder. Tr. 495. Dr. Wax diagnosed attention deficit disorder combined; depressive disorder, NOS; personality disorder, dependent; and borderline intelligence. Tr. 496. Dr. Wax provided the following opinions regarding Perry's functional abilities:

**Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

This individual was able to understand, remember and carry out instructions to work at a job for a year in a factory until December of 2011.  He stated he was able to do household chores before hurting his back.   Currently his girlfriend does household chores for him.   During today's evaluation he did have difficulty understanding, remembering and carrying out instructions, and did need questions simplified and repeated.   He was inattentive and directions often needed to be repeated and simplified.  (Attention deficit disorder and borderline intelligence is suspected.)   This individual's WAIS-IV FSIQ was also in the borderline range.  There was a significant difference among his Subtest scores and Composite scores on the WAIS-IV, and there was also a significant difference among his Index scores and Scaled scores on the WMS-IV, also indicating a learning disorder.  He was in special education classes while in public school.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

This individual would have difficulty maintaining attention and concentration on a job due to his attention deficit disorder.   He had difficulty attending and concentrating during today's evaluation.  He though is persistent, and did complete tasks on his job when working in a factory for a year.  He is able to perform simple tasks and perform multi-step tasks based upon his ability to hold a job for a year working in a factory.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

This individual would respond appropriately to supervisors and coworkers in a work setting based on his ability to work successfully for a year with coworkers and supervisors until December of 2011.   He had no difficulty with this psychologist.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

This individual would respond appropriately to work pressures in a work setting based upon his ability to work successfully for a year in a factory until December of 2011.

Tr. 496-497.

### b. Reviewing physicians/psychologists

*Physical*

On March 22, 2012, state agency reviewing physician Dr. Sarah Long, M.D., completed a physical RFC assessment. Tr. 89-91. Dr. Long opined that Perry could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds; could stand and/or walk for a total of two hours; could sit for a total of 6 hours; and could push and/or pull unlimitedly, other than as shown for lift and/or carry. Tr. 89-90. Dr. Long explained the noted exertional limitations, indicating that Perry had documented hip osteoarthritis and difficulties with antalgic gait and ambulates with a limp. Tr. 90. Dr. Long opined that Perry had the following postural limitations – occasional climbing ramps/stairs, climbing ladder/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling. Tr. 90. Dr. Long explained the postural limitations by referring to the previously noted limitations with ambulation and Perry's documented herniated discs and positive left straight leg raise. Tr. 90. Dr. Long found no manipulative, visual, communicative or environmental limitations. Tr. 90. Dr. Long indicated that Perry appeared capable of sedentary work. Tr. 90.

Upon reconsideration, on September 5, 2012, state agency reviewing physician Dr. Edmond Gardner, M.D., completed a physical RFC assessment. Tr. 117-119. Dr. Gardner concluded that Perry would have exertional limitations similar to those found by Dr. Long except he also found that Perry would be unable to operate foot controls on the right, noting that he had considered Perry's pain along with the a cane being obligatory to relieve pain; Perry's antalgic gait with numbness in the thighs, calves, and tops of the feet; and Perry's decreased strength on the right. Tr. 118. With respect to postural limitations, Dr. Gardner opined that Perry had the following postural limitations – no climbing ladders/ropes/scaffolds and occasional climbing

ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. Tr. 90. Dr. Gardner found

that Perry would be required to avoid all exposure to hazards (machinery, heights, etc.), noting

Perry's back and hip problems. Tr. 118-119. Dr. Gardner found no manipulative, visual or

communicative limitations. Tr. 118. Dr. Gardner indicated that Perry appeared capable of

sedentary work. Tr. 119.

>_Mental_

On April 14, 2012, state agency reviewing psychologist Dr. Caroline Lewin, Ph.D.,

completed a Psychiatric Review Technique ("PRT") and mental RFC assessment (Tr. 91-92).

Dr. Lewin considered Listings 12.02, 12.04, and 12.08, but found that no listing was satisfied.

Tr. 87-88. Dr. Lewin opined that Perry had moderate restrictions in activities of daily living,

mild difficulties in maintaining social functioning, moderate difficulties in maintaining

concentration persistence or pace, and no repeated episodes of decompensation, each of extended

duration. Tr. 88. In the mental RFC assessment, Dr. Lewin opined that Perry would be capable

of simple, routine tasks that do not require a fast pace or strict production standards and changes

would need to be explained to him. Tr. 91-92.

Upon reconsideration, on August 28, 2012, state agency reviewing psychologist Dr.

Bruce Goldsmith, Ph.D., completed a PRT (Tr. 115-116) and mental RFC assessment (Tr. 119-

121). Dr. Goldsmith reached the same conclusions as Dr. Lewin. Tr. 115-116, 119-121.

## C.   Other evidence

### 1.   Plaintiff's testimony

Perry was represented and testified at both hearings. Tr. 36-46 (December 9, 2015,

hearing), 58-72 (December 18, 2013, hearing). At the December 9, 2015, hearing, the ALJ

indicated that the record was not up-to-date, noting that there were no medical records after

November 11, 2013. Tr. 35. The ALJ provided Perry and Perry's counsel one month in which to obtain more up-to-date records. Tr. 35-36, 54.

### 2. Medical expert's testimony

At the December 9, 2015, hearing, the ALJ called medical expert Martin Macklin, M.D., Ph.D.,[4] as a witness to provide his expert opinion regarding Perry's impairments. Tr. 47-54, 635. The ALJ asked Dr. Macklin to describe Perry's severe impairments. Tr. 47. Dr. Macklin noted treatment records which indicated that Perry would get confused about time frames and did not remember dates very well. Tr. 47. Dr. Macklin discussed the report of Dr. Wax, the consultative examiner, wherein it was noted that Perry had attention deficit disorder, depression and a learning disorder. Tr. 47. Dr. Macklin noted that the record reflected significant back problems and hip problems. Tr. 47-48. Dr. Macklin noted an understandable reluctance by the surgeons to perform back surgery because there were three levels at play with respect to Perry's back (L3-4, L4-5, and L5-S1) and Perry continued to smoke. Tr. 48. Dr. Macklin observed that the records reflected that Perry walked kind of doubled over, i.e., bent over without the spine actually being bent, and his gait was abnormal. Tr. 48. Dr. Macklin indicated that the record supported "the fact that [Perry] can't really stand and walk in any, in any reasonable amount of time. And so that would be a significant limitation." Tr. 48. He also stated that it was reasonable that Perry would experience pain as the result of his back and hip conditions. Tr. 53. Additionally, Dr. Macklin indicated that, due to carpal tunnel, Perry would have a reduced ability to manipulate. Tr. 48, 52. Dr. Macklin indicated that manipulative limitations might entail limitations with repetitive fine manipulation and possibly gross manipulation. Tr. 52. Dr. Macklin agreed that

---

[4] Dr. Macklin's primary specialty is psychiatry. Tr. 635.

the record did not clearly document the need for a manipulative limitation less than frequent. Tr. 50.

Dr. Macklin opined that Perry would meet Listing 12.05C[5] because of his intelligence test scores and his additional physical problem. Tr. 48-49. The ALJ reminded Dr. Macklin that Listing 12.05 required a showing a significant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., onset prior to age 22. Tr. 49. Dr. Macklin responded, "Oh, I'm sure this is lifetime, lifelong, oh, yeah." Tr. 49. However, when pressed further by the ALJ regarding the need for evidence, not just speculation, Dr. Macklin admitted, "Okay. Well, I have to agree with you, we don't have records to go back there." Tr. 49. Dr. Macklin noted that school records would help but he did not know whether there were any available. Tr. 49. Later during Dr. Macklin's testimony, the ALJ asked him whether, instead of Listing 12.05C, would Perry meet Listing 12.02. Tr. 53. Dr. Macklin reflected that Listing 12.02 requires a loss of cognitive ability and he did not think Perry ever had cognitive ability. Tr. 53-54.

Moving on from Listing 12.05, the ALJ directed Dr. Macklin to the state agency reviewing physicians' opinions that indicated Perry could only stand/walk for 2 out of 8 hours a day and sit for 6 out of 8 hours a day and would be limited to no foot controls on the right and had certain postural limitations. Tr. 49-50. The ALJ asked Dr. Macklin whether, in his opinion, Perry met a physical listing. Tr. 50. Dr. Macklin indicated that Perry had significant physical limitations but Perry did not clearly meet a listing, noting that a physical listing requires that both hands are needed for ambulation but Perry only used a single cane. Tr. 50. Dr. Macklin added

---

[5] Listing 12.05 relates to intellectual disability.

that he questioned the state agency physicians' opinions that Perry could spend 2 hours on his feet during a workday.  Tr. 50.

 Perry's counsel later asked Dr. Macklin whether he had an opinion as to whether or not Perry <u>equaled</u> Listing 1.02.[6]  Tr. 52.  Dr. Macklin indicated that he did not think that Perry met Listing 1.02 based on the way it is described.  Tr. 52.  The ALJ reminded Dr. Macklin that the question was whether Perry <u>equaled</u> the listing.[7]  Tr. 53.  In response, Dr. Macklin opined that Perry would <u>equal</u> the listing.  Tr. 53.

The ALJ asked Dr. Macklin whether he could give an RFC based on the record.  Tr. 50. Dr. Macklin opined that Perry could stand and walk no more than 10 minutes at a time; he could not do any physical labor standing because of postural limitations and back pain so any employment activity would have to be performed from a seated position; because of his difficulties with time and understanding, tasks would have to be simple and repetitive with no significant time pressure on him; and he could not deal with the public but could relate to coworkers and supervisors.  Tr. 50-51.

### 2.    Vocational expert's interrogatory responses

At the hearing, the ALJ indicated he was not going to take testimony from the VE at the hearing but noted that, if he needed the VE testimony, he would obtain it later through interrogatories.  Tr. 54-55.  On March 30, 2016, the ALJ sent vocational interrogatories to the VE, requesting that the VE indicate whether there would jobs available to an individual with the limitations set forth in the RFC as ultimately determined by the ALJ.  Tr. 17, 392-396.  The VE responded to those interrogatories, identifying three jobs that the described individual could

---

[6] Listing 1.02 relates to major dysfunction of a joint.

[7] If it is determined at Step Three that a claimant's impairment(s) meets or equals a listing, the claimant will be found disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

perform (marker, office helper, and photocopying machine operator). Tr. 397-399. The ALJ proffered the VE's interrogatory responses to Perry's counsel. Tr. 400-401. On May 20, 2016, Perry, through counsel, responded to the proffer, stating that Perry had no comments to the VE's vocational analysis and, instead, was relying on the medical expert's hearing testimony that Perry met Listing 12.05C and equaled Listing 1.02. Tr. 403.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.     If claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his September 9, 2016, decision the ALJ made the following findings:[11]

1.    Perry meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 14.

2.    Perry has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date. Tr. 14.

3.    Perry has the following severe impairments: degenerative disc disease, osteoarthritis and femoral acetabular impingement of the right hip,

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[11] The ALJ's findings are summarized.

attention deficit disorder, borderline intellectual functioning, and depression. Tr. 14. Carpal tunnel syndrome was a non-severe impairment and, other alleged impairments were non-severe or not medically determinable impairments. Tr. 15.

4.     Perry does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-17.

5.     Perry has the RFC to lift/carry ten pounds frequently and ten pounds occasionally, stand/walk a total of 4 hours out of 8 hours a day and stand/walk 1 hour at a time out of 8 hours a day, sit 6 hours out of 8 hours a day, and frequently push/pull with the right upper extremity and constantly with the left upper extremity. Perry can never climb ladders, ropes or scaffolds. Perry can never kneel, or crawl but can occasionally climb ramps and stairs, balance, stoop and crouch. Perry must avoid high concentrations of extreme cold, extreme heats, wetness, and humidity and must avoid all exposure to machinery and heights. Perry can understand, remember, and carry out simple instructions, respond appropriately to supervision, coworkers, and usual work situations, deal with changes in a routine work setting, and make judgments that are commensurate with the functions of unskilled work. Perry cannot perform complex tasks but is limited to simple, routine tasks, low stress work, i.e., no high production quotas or piece rate work or work involving no arbitration, confrontation, or negotiation, and he is limited to no interaction with the public. Tr. 17-22.

6.     Perry is unable to perform any past relevant work. Tr. 22-23.

7.     Perry was born in 1969 and was 40 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 23.

8.     Perry has a limited education and is able to communicate in English. Tr. 23.

9.     Transferability of job skills is not an issue. Tr. 23.

10.     Considering Perry's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Perry can perform, including marker, office helper, and photocopy machine operator. Tr. 23-24.

Based on the foregoing, the ALJ determined Perry had not been under a disability, as defined in the Social Security Act, from January 1, 2010, through the date of the decision. Tr. 24.

## V. Plaintiff's Arguments

Perry argues that the ALJ erred in concluding that he did not meet or equal Listings 1.02 and 12.05C. Doc. 15, pp. 15-19. Perry also argues that the ALJ erred in evaluating the opinions of the state agency physicians and psychologists and the medical expert's opinions. Doc. 15, pp. 19-21.

## VI. Law & Analysis

### A. Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.      Reversal and remand is warranted

Perry argues that the ALJ erred at Step Three because he failed to properly analyze whether his impairments equaled Listing 1.02 and failed to consider Listing 12.05C. Doc. 12, pp. 14-17. Perry also argues that the ALJ did not adequately consider or explain the weight assigned to the medical opinions offered by the medical expert and the state agency reviewing physicians and psychologists. Doc. 12, pp. 19-21.

A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011). Thus, without an ALJ's evaluation of the evidence, comparison of that evidence to the Listings and an explanation of the conclusion reached, meaningful judicial review cannot occur and "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (*citing Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). That is why the Sixth Circuit found, in *Reynolds*, that an ALJ's failure to analyze a claimant's physical condition in relation to the Listed Impairments was not harmless error. *Id.; see also May v. Astrue*, 2011 U.S. Dist. LEXIS 88551, *24-25 (N.D. Ohio June 1, 2011) *report and recommendation adopted*, *May v. Astrue*, 2011 U.S. Dist. LEXIS 88548 (N.D. Ohio Aug. 10, 2011).

At the December 9, 2015, hearing, medical expert Dr. Macklin offered his opinions regarding Perry's medical impairments, including whether Perry's impairments met or equaled listings. Perry argues that the ALJ failed to consider Dr. Macklin's opinion that Perry's

impairments equaled Listing 1.02 (Major dysfunction of a joint(s)) and did not discuss Listing 12.05C (Intellectual disorder) or Dr. Macklin's opinion that Perry's impairments met Listing 12.05C.

Listing 1.02

Listing 1.02A states,

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
>    or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.[12]

20 C.F.R. Pt. 404, Supbt. P, App.1.

> What is meant by an inability to ambulate effectively, is explained as follows in 1.00B2b:
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a

---

[12] The focus of Perry's argument is on 1.02A. Therefore, 1.00B2c is not recited herein.

reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

1.00B2b(1)-(2).

At Step Three, the ALJ discussed Listing 1.02, stating,

In reaching this conclusion, I reviewed the claimant's hip impairment using Section 1.00 (Musculoskeletal System), specifically Section 1.02 (Major dysfunction of a joint(s) - due to any cause) of the Listing of Impairments contained in 20 CFR Part 404, Appendix 1 to Subpart P. In the instant case, the claimant has not established that he meets the requisite conditions of Section 1.02. Specifically, the claimant neither established that he is unable to ambulate effectively, nor established that he is unable to perform fine and gross movements effectively.

Listing 1.02 specifically requires a condition characterized by: gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability); chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s); and findings using appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affectedjoint(s). These conditions must be met along with: (1) Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in l.00B2b or (2) Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in l.00B2c. The medical evidence of record does not indicate that the claimant meets any of the above requirements.

Tr. 15.

Although the ALJ reached the conclusion that Perry's impairments did not <u>meet</u> Listing 1.02, the ALJ did not address whether Perry's impairments <u>equal</u> Listing 1.02. The failure of the ALJ to address whether Perry's impairments equal Listing 1.02 is problematic because Dr. Macklin testified that, while Perry's impairments did not meet Listing 1.02, Perry's impairments <u>equaled</u> Listing 1.02. Tr. 50, 52-53. More particularly, Dr. Macklin's testimony regarding Perry's physical impairments included the following exchanges:

EXAMINATION OF MEDICAL EXPERT BY [ALJ]:

\*\*\*

Q        . . . [I]n your opinion, does he meet a physical listing?

A        He doesn't clearly meet a physical listing, no, but he does have significant

limitations physical.  A physical listing requires him to require both hands for

ambulation and since he only uses a single cane then he doesn't meet them.

Q        Okay.

A        I would question whether he could spend two hours on his feet in the

course of a work day.

\*\*\*

Q        Okay.  Are you able to give me an RFC, doctor, based upon the record as

we know it?

A        Yes. I would say that he could stand and walk no more than 10 minutes at

a time based on the record and that's -- that is in the record.

Q        Okay.

A        He can't do any physical labor standing because of postural limitations

and back pain.  So any activity he would -- any employment activity he would

have to be seated . . .

\*\*\*

EXAMINATION OF MEDICAL EXPERT BY ATTORNEY:

\*\*\*

Q        . . . Do you have an opinion as to whether or not he equals 1[.]02?

A       1[.]02.  That requires him to -- it's the effective ambulation in there that --

let me look.  I don't think the way it's described he actually meets it.

ALJ:    Now, <u>the question was, doctor, whether he equaled</u>?

ME:     Let's see, let me one.  Let me look at that.  I would say <u>he would equal it</u>.

To meet it he would have to meet the inability to ambulate effectively but <u>I think</u>

<u>equivalent he would equal that, yes, even though he doesn't meet it</u>.

Tr. 47, 48, 50, 52-53 (emphasis supplied).

The ALJ does not mention, discuss or weigh Dr. Macklin's opinion that Perry's

impairments would equal Listing 1.02.[13]  Although the heading of paragraph 4 states that Perry

did not have an impairment or combination of impairments that met or medically equaled a

Listing, when addressing Listing 1.02, the ALJ only addressed whether Perry's impairments <u>met</u>

Listing 1.02, not whether they <u>equaled</u> Listing 1.02.  Tr. 15.  Without a more thorough analysis

of Dr. Macklin's opinion that Perry's impairments equal Listing 1.02, the Court is unable to

conduct a meaningful review to assess whether the ALJ's Step Three finding as it pertains to

Listing 1.02 is supported by substantial evidence.  The Court will not engage in speculation or

post hoc rationalization to determine whether or how the ALJ weighed Dr. Macklin's Listing

1.02 opinion.  Accordingly, reversal and remand is warranted for further analysis of Dr.

Macklin's opinion.

<u>Listing 12.05C</u>

Perry contends that reversal and remand is also warranted because the ALJ did not

consider Listing 12.05C at Step Three and because he ignored Dr. Macklin's testimony that he

met Listing 12.05C.

---

[13] At a later step in the sequential evaluation process, the ALJ discussed and weighed Dr. Macklin's opinion as it related to dealing with the public and Listing 12.02.  Tr. 21.

Listing 12.05 relates to intellectual disability. To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the introductory paragraph of Listing 12.05 and one of the four sets of criteria found in Subparts A through D. 20 C.F.R. § 404.1525(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-355 (6th Cir. 2001). The diagnostic description is as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 354). "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 Fed. Appx. at 677.

> The additional Subpart C criteria are:
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1.

Although Dr. Macklin initially testified that Perry's mental impairments would meet Listing 12.05C, (Tr. 48-49), upon further questioning regarding the diagnostic description of 12.05C, Dr. Macklin agreed that there were no records to assess whether the evidence demonstrated onset of the impairment before age 22. Tr. 49. Considering Dr. Macklin's acknowledgement of the lack of records for the pertinent time period, reversal and remand solely on the issue of whether Perry's impairments meet or equal Listing 12.05C may not be warranted.

However, since the ALJ failed to discuss Listing 12.05C, including Dr. Macklin's testimony relative to that listing, and because reversal and remand is warranted for the reasons discussed above, on remand, there should be analysis with respect to Listing 12.05C.

Medical opinion evidence

Perry argues that reversal and remand is also warranted for a more thorough analysis of the medical opinions rendered by the medical expert and the state agency reviewing physicians and psychologists.

As discussed above, the ALJ did not adequately evaluate all of Dr. Macklin's opinions. Accordingly, on remand, the ALJ shall sufficiently explain the weight assigned to Dr. Macklin's opinions and the reasons for assigning that weight.

Perry argues that the ALJ also did not explain why he rejected the opinions of the state agency physicians and psychologists that Perry could only stand/walk for a total of 2 hours and would need a cane, nor did the ALJ explain the weight/reasons for the weight he gave to the opinions that changes in the work setting would need to be explained to Perry. The ALJ assigned partial weight to the opinions rendered by the state agency reviewing physicians and psychologists. Tr. 20. He assigned great weight to certain portions of their opinions, little weight to other portions, and did not explain what weight he assigned to the physicians' standing/walking limitations. Tr. 20. The latter failure warrants reversal and remand because the ALJ's RFC standing/walking limitations are in conflict with the state agency reviewing physicians' opinions on the matter. For example, the state agency reviewing physicians opined that Perry could stand and/or walk for a total of 2 hours and sit for a total of about 6 hours in an 8-hour workday. Tr. 20, 90, 117. The ALJ's RFC contains less restrictive standing/walking limitations, i.e., the ALJ concluded that Perry had the RFC to stand/walk a total of 4 hours out of

8 hours a day and stand/walk for 1 hour at a time.  Tr. 17.   Without a more complete analysis by the ALJ regarding how the state agency reviewing physicians' standing/walking limitations were weighed, the Court is unable to conduct a meaningful review to assess whether the RFC is supported by substantial evidence.   Additionally, further evaluation of Dr. Macklin's opinion on remand may have an impact on the ALJ's other conclusions relating to the opinions of the state agency reviewing physicians and psychologists and the weight assigned to those opinions.  Thus, on remand the ALJ should reconsider and weigh the entirety of state agency reviewing physicians/psychologists' opinions.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for proceedings consistent with this opinion.

Dated: October 5, 2018

   */s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge